**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTIAN DIOR COUTURE, S.A., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-00366 |
| | ) | |
| v. | ) | |
| | ) | |
| THE PARTNERSHIPS and | ) | |
| UNINCORPORATED ASSOCIATIONS | ) | |
| IDENTIFIED ON SCHEDULE "A," | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**COMPLAINT**

Plaintiff Christian Dior Couture, S.A. ("Dior") hereby brings the present action against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants") and alleges as follows:

**I. JURISDICTION AND VENUE**

1.     This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq*., 28 U.S.C. § 1338(a)-(b) and 28 U.S.C. § 1331.  This Court has jurisdiction over the claims in this action that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets business activities toward consumers in the United States, including Illinois, through at least the fully interactive, commercial Internet stores operating under the Defendant Domain

Names and/or the Online Marketplace Accounts identified in Schedule A attached hereto (collectively, the "Defendant Internet Stores"). Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive Defendant Internet Stores through which Illinois residents can purchase products using counterfeit versions of Dior's trademarks. Each of the Defendants has targeted sales from Illinois residents by operating online stores that offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, has sold products using counterfeit versions of Dior's trademarks to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Dior substantial injury in the State of Illinois.

## II. INTRODUCTION

3.      This action has been filed by Dior to combat online counterfeiters who trade upon Dior's reputation and goodwill by selling and/or offering for sale a wide variety of clothing and fashion accessories, eyewear, leather goods, jewelry, watches and other similar items using counterfeit versions of Dior's federally registered trademarks (collectively, the "Counterfeit Dior Products"). The Defendants create the Defendant Internet Stores by the hundreds and design them to appear to be selling genuine Dior products, while actually selling Counterfeit Dior Products to unknowing consumers. The Defendant Internet Stores share unique identifiers, such as design elements and similarities of the counterfeit products offered for sale, establishing a logical relationship between them and suggesting that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their counterfeiting operation. Dior is forced to file these

actions to combat Defendants' counterfeiting of its registered trademarks, as well as to protect unknowing consumers from purchasing Counterfeit Dior Products over the Internet. Dior has been and continues to be irreparably damaged through consumer confusion, dilution, and tarnishment of its valuable trademarks as a result of Defendants' actions and seeks injunctive and monetary relief.

### III. THE PARTIES

**Plaintiff**

4.       Dior is organized and existing under the laws of France with its principal place of business in Paris, France.

5.       Dior is a world-famous couturier engaged in the business of styling and selling diverse articles of men's and women's apparel and fashion accessories. Dior is famous for its leadership, style, excellence, and quality in the field of fashion, and is widely recognized as one of the principal style innovators and leaders in the fashion field. Dior is engaged in the manufacture, sale and distribution of prestigious, high-quality, luxury merchandise, including a wide variety of clothing and fashion accessories, eyewear, leather goods, jewelry, watches and other similar items sold throughout the United States (collectively, the "Dior Products"), all of which prominently display its famous, internationally-recognized and federally-registered trademarks, including CHRISTIAN DIOR, DIOR, CD, and  (the "Cannage Design"). Dior Products have become enormously popular and even iconic, driven by Dior's arduous quality standards and innovative designs. Among the purchasing public, genuine Dior Products are instantly recognizable as such. In the United States and around the world, the Dior brand has come to symbolize high quality, and Dior Products are among the most recognizable of their kind in the world.

6.   Dior Products are distributed and sold to consumers through retailers throughout the United States in company-operated Dior boutiques and in high-quality department stores in Illinois such as Barneys, Bloomingdales, Nordstrom, Neiman Marcus, and Saks Fifth Avenue.

7.   Dior incorporates a variety of distinctive marks in the design of its various Dior Products.  As a result of its long-standing use, Dior owns common law trademark rights in its trademarks.  Dior has also registered its trademarks with the United States Patent and Trademark Office.  Dior Products typically include at least one of Dior's registered trademarks.  Often several Dior marks are displayed on a single product.  Dior uses its trademarks in connection with the marketing of its Dior Products, including the following marks which are collectively referred to as the "CHRISTIAN DIOR Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 519,367 | CHRISTIAN DIOR | December 27, 1949 | For: Jewelry for personal wear, not including watches-namely, trinkets, necklaces, bracelets, finger rings, earrings, brooches, and ornamental clips made in whole of, in part of, or plated with precious metals in class 014. |
| 543,994 | CHRISTIAN DIOR | June 19, 1951 | For: Handbags and pocketbooks in Class 018. |
| 580,207 | CHRISTIAN DIOR | September 22, 1953 | For: Jewelry for personal wear, not including watches-namely, trinkets, necklaces, bracelets, finger rings, earrings, brooches, and ornamental clips made in whole of, in part of, or plated with precious metals in class 014. |
| 954,404 | CHRISTIAN DIOR | March 6, 1993 | For: Eyeglass frames, sunglasses and eyeglass cases in Class 009. |
| 1,123,944 | CD | August 14, 1979 | For: Optical apparatus – namely, eyeglass frames in Class 009. |

4

| | | | |
|---|---|---|---|
| | | | For: Jewelry and horological instruments – namely, women's costume jewelry, bracelets, and watches for men and women in Class 014.<br><br>For: Articles made from leather and imitations thereof, namely, luggage for men and women in Class 018.<br><br>For: Women's blouses, skirts, dresses, jackets, suits, coats; Men's suits, belts and sports jackets in Class 025. |
| 1,776,536 |  | June 15, 1993 | For: Carry-on bags; change purses; clutch bags; clutch purses; golf umbrellas; handbags; luggage; passport cases, holders or wallets; pocketbooks; purses; shoulder bags; all-purpose sports bags; suitcases; tote bags; travel bags; and wallets in Class 018.<br><br>For: Clothing for use by men, women and children; namely, blouses; gloves; vests in Class 025. |
| 1,872,313 |  | January 10, 1995 | For: Eyeglass frames; parts thereof; and sunglasses in Class 009.<br><br>For: Rings in Class 014. |
| 1,923,564 | Dior | October 3, 1995 | For: Belt buckles of precious metals for clothing; brooches; charms; costume jewelry; ear clips; jewelry; jewelry lapel pins; ornamental pins; pendants; watch bands; watch chains; watch fobs; and watches in Class 014. |

| | | | For: billfolds; business card cases; carry-on bags; change purses; clutch bags; clutch purses; coin purses; credit card cases; drawstring pouches; handbags; key cases; overnight bags; passport cases, holders or wallets; purses; shoulder bags; and wallets in Class 018. |
|---|---|---|---|
| 2,240,163 | | April 20, 1999 | For: satchels, clutch bags, rucksacks, change purses, pocketbooks, purses, wallets in Class 018. |
| 3,561,323 | | January 13, 2009 | For: optical apparatus and instruments, namely, spectacles, sunglasses, spectacle cases, and spectacle frames in Class 009. |
| 2,749,176 | | August 12, 2003 | For: Athletic bags; attache cases; baby carriers worn on the body; backpacks; beach bags; beach umbrellas; billfolds; book bags; briefcase-type portfolios; briefcases; business card cases; carry-on bags; non-motorized collapsible luggage carts; change purses; clutch bags; clutch purses; coin purses; cosmetic cases sold empty; credit card cases; diaper bags; document cases; drawstring pouches; duffel bags; fanny packs; felt pouches; garment bags for travel; golf umbrellas; gym bags; handbags; hat boxes for travel; key cases; knapsacks; luggage; overnight bags; overnight cases; parasols; passport cases, holders and wallets; patio umbrellas; pocketbooks; purses; satchels; school bags; shoe bags for travel; leather shopping bags; mesh shopping bags; textile shopping |

bags; shoulder bags; all-purpose sports bags; suitcases; toiletry cases sold empty; tote bags; travel bags; trunks for traveling; umbrellas; valises; vanity cases sold empty; waist packs; wallets in Class 018.

For: Clothing for use by men, women and children; namely, anoraks; aprons; ascots; babushkas; bandannas; bathing suits; bathrobes; belts; blazers; blouses; blousons; bodysuits; boleros; boots; boxer shorts; brassieres; briefs; baby buntings; caftans; camisoles; capes; caps; cardigans; chemises; clogs; cloth diapers; fur coats; suit coats; top coats; corselets; culottes; dresses; earmuffs; galoshes; garter belts; girdles; gloves; nightgowns; halter tops; hats; headbands; hosiery; jackets; jeans; jogging suits; jumpers; jumpsuits; kerchiefs; kimonos; leggings; leotards; loungewear; mittens; moccasins; mufflers; neckerchiefs; neckties; neckwear; negligees; nightshirts; overalls; overcoats; overshoes; pajamas; panties; pants; pantsuits; pantyhose; parkas; pedal pushers; peignoirs; pinafores; playsuits; pocket squares; ponchos; pullovers; raincoats; sandals; scarves; shawls; shirts; shorts; undershirts; shoes; sweat shorts; skirts; ski suits; slacks; snowsuits; socks; sport coats; sport shirts; stockings; stoles; suits; suspenders; sweat pants; sweatshirts; sweaters; t-shirts; trousers; tuxedos; underpants; vests; vested suits; and warm-up suits in Class 025.

| 5,173,476 | DIOR SO REAL | April 4, 2017 | For: Eyeglasses, sunglasses, goggles for sports; spectacle frames, spectacle cases; containers for contact lenses; protective cases, bags, satchels and covers for computers, tablets, mobile telephones and MP3 players in Class 009.<br><br>For: Jewelry; precious stones; precious metals and their alloys, jewelry bracelets, jewelry brooches, jewelry necklaces, jewelry chains, medals, pendants, earrings, rings, charms, tie pins; cuff links; key rings of precious metals; jewelry cases; boxes of precious metal; boxes, cases and presentation cases for timepieces and jewelry; timepieces, chronometric instruments, watches, watch bands in Class 014.<br><br>For: Leather and imitation leather; animal skins and furs; trunks and suitcases; wallets; coin purses; credit card holders; briefcases of leather or imitation leather; key cases of leather or imitation leather; garment bags for travel; all-purpose carrying bags, backpacks, handbags, traveling bags; vanity cases sold empty; clutch bags of leather; toiletry and make-up bags sold empty; boxes of leather; umbrellas in Class 018. |
| --- | --- | --- | --- |

8.     The CHRISTIAN DIOR Trademarks have been used exclusively and continuously in the U.S. by Dior, and have never been abandoned. The above U.S. registrations for the CHRISTIAN DIOR Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. Attached hereto as **Exhibit 1** are true and correct copies of the U.S. Registration Certificates for the CHRISTIAN DIOR Trademarks

included in the above table.  The registrations for the CHRISTIAN DIOR Trademarks constitute *prima facie* evidence of their validity and of Dior's exclusive right to use the CHRISTIAN DIOR Trademarks pursuant to 15 U.S.C. § 1057(b).

9.      The CHRISTIAN DIOR Trademarks are exclusive to Dior, and are displayed extensively on Dior Products and in Dior's marketing and promotional materials.  Dior Products have long been among the most famous and popular of their kind in the world and have been extensively promoted and advertised at great expense.  In fact, Dior has expended millions of dollars annually in advertising, promoting and marketing featuring the CHRISTIAN DIOR Trademarks.  Dior Products have also been the subject of extensive unsolicited publicity resulting from their high quality and popularity among high profile celebrities who don Dior Products at red carpet events.  Because of these and other factors, the Dior name and the CHRISTIAN DIOR Trademarks have become famous throughout the United States.

10.      The CHRISTIAN DIOR Trademarks are distinctive when applied to the Dior Products, signifying to the purchaser that the products come from Dior and are manufactured to Dior's quality standards.  Whether Dior manufactures the products itself or licenses others to do so, Dior has ensured that products bearing its trademarks are manufactured to the highest quality standards.  The CHRISTIAN DIOR Trademarks have achieved tremendous fame and recognition, which has only added to the distinctiveness of the marks.  As such, the goodwill associated with the CHRISTIAN DIOR Trademarks is of incalculable and inestimable value to Dior.

11.      Since at least as early as 1999, Dior has operated a website where it promotes Dior Products at dior.com.  Dior Products are featured and described on the website and, since

2001, some of them are available for purchase. The dior.com website features proprietary content, images, and designs exclusive to Dior.

12. Dior has expended substantial time, money, and other resources in developing, advertising and otherwise promoting the CHRISTIAN DIOR Trademarks. As a result, products bearing the CHRISTIAN DIOR Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being high quality products from Dior. Dior is a multi-million dollar operation, and Dior Products have become among the most popular of their kind in the world.

**The Defendants**

13. Defendants are individuals and business entities who, upon information and belief, reside in the People's Republic of China or other foreign jurisdictions. Defendants conduct business throughout the United States, including within the State of Illinois and this Judicial District, through the operation of the fully interactive commercial websites and online marketplaces operating under the Defendant Internet Stores. Each Defendant targets the United States, including Illinois, and has offered to sell, and, on information and belief, has sold and continues to sell Counterfeit Dior Products to consumers within the United States, including the State of Illinois.

14. On information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell products using counterfeit versions of the CHRISTIAN DIOR Trademarks in the same transaction, occurrence, or series of transactions or occurrences. Tactics used by Defendants to conceal their identities and the full scope of their counterfeiting operation make it virtually impossible for Dior to learn Defendants' true identities and the exact interworking of

their counterfeit network.  In the event that Defendants provide additional credible information regarding their identities, Dior will take appropriate steps to amend the Complaint.

### IV. DEFENDANTS' UNLAWFUL CONDUCT

15.     The success of the Dior brand has resulted in its significant counterfeiting. Consequently, Dior has a worldwide anti-counterfeiting program and regularly investigates suspicious websites and online marketplace listings identified in proactive Internet sweeps and reported by consumers.  In recent years, Dior has identified thousands of domain names linked to fully interactive websites and marketplace listings on platforms such as iOffer, eBay, AliExpress, and Alibaba, including the Defendant Internet Stores, which were offering for sale and selling Counterfeit Dior Products to consumers in this Judicial District and throughout the United States.  Despite Dior's enforcement efforts online and on the ground, Defendants have persisted in creating the Defendant Internet Stores.  Internet websites like the Defendant Internet Stores are estimated to receive tens of millions of visits per year and to generate over $135 billion in annual online sales.  According to an intellectual property rights seizures statistics report issued by Homeland Security, the manufacturer's suggested retail price (MSRP) of goods seized by the U.S. government in fiscal year 2014 was over $1.23 billion.  Internet websites like the Defendant Internet Stores are also estimated to contribute to tens of thousands of lost jobs for legitimate businesses and broader economic damages such as lost tax revenue every year.

16.     Defendants facilitate sales by designing the Defendant Internet Stores so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. Many of the Defendant Internet Stores look sophisticated and accept payment in U.S. dollars via credit cards, Western Union and PayPal.  The Defendant Internet Stores often include content and design elements that make it very difficult for consumers to distinguish such counterfeit sites

from an authorized website. Many Defendants further perpetuate the illusion of legitimacy by offering customer service and using indicia of authenticity and security that consumers have come to associate with authorized retailers, including the Visa®, MasterCard®, and/or PayPal® logos. Dior has not licensed or authorized Defendants to use any of the CHRISTIAN DIOR Trademarks, and none of the Defendants are authorized retailers of genuine Dior Products.

17. Many Defendants also deceive unknowing consumers by using the CHRISTIAN DIOR Trademarks without authorization within the content, text, and/or meta tags of their websites in order to attract various search engines crawling the Internet looking for websites relevant to consumer searches for Dior Products. Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so that the Defendant Internet Stores listings show up at or near the top of relevant search results and misdirect consumers searching for genuine Dior Products. Other Defendants only show the CHRISTIAN DIOR Trademarks in product images while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Dior Products.

18. Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their network of Defendant Internet Stores. For example, many of Defendants' names and physical addresses used to register the Defendant Domain Names are incomplete, contain randomly typed letters, or fail to include cities or states. Other Defendant Domain Names use privacy services that conceal the owners' identity and contact information. On information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet

Store registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

19. Even though Defendants operate under multiple fictitious names, there are numerous similarities among the Defendant Internet Stores. For example, many of the Defendant websites have virtually identical layouts, even though different aliases were used to register the respective domain names. In addition, Counterfeit Dior Products for sale in the Defendant Internet Stores bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit Dior Products were manufactured by and come from a common source and that Defendants are interrelated. The Defendant Internet Stores also include other notable common features, including use of the same domain name registration patterns, shopping cart platforms, accepted payment methods, check-out methods, meta data, illegitimate SEO tactics, HTML user-defined variables, domain redirection, lack of contact information, identically or similarly priced items and volume sales discounts, the same incorrect grammar and misspellings, similar hosting services, similar name servers, and the use of the same text and images, including content copied from Dior's official dior.com website.

20. In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts. For example, counterfeiters like Defendants will often register new domain names or online marketplace accounts under new aliases once they receive notice of a lawsuit. Counterfeiters also often move website hosting to rogue servers located outside the United States once notice of a lawsuit is received. Rogue servers are notorious for ignoring take down demands sent by brand owners. Counterfeiters also typically ship products

13

in small quantities via international mail to minimize detection by U.S. Customs and Border Protection.

21.     Further, counterfeiters such as Defendants typically operate multiple credit card merchant accounts and PayPal accounts behind layers of payment gateways so that they can continue operation in spite of Dior's enforcement efforts.  On information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal accounts to off-shore bank accounts outside the jurisdiction of this Court.  Indeed, analysis of PayPal transaction logs from previous similar cases indicates that off-shore counterfeiters regularly move funds from U.S.-based PayPal accounts to China-based bank accounts outside the jurisdiction of this Court.

22.     Defendants, without any authorization or license from Dior, have knowingly and willfully used and continue to use the CHRISTIAN DIOR Trademarks in connection with the advertisement, distribution, offering for sale, and sale of Counterfeit Dior Products into the United States and Illinois over the Internet.  Each Defendant Internet Store offers shipping to the United States, including Illinois, and, on information and belief, each Defendant has sold Counterfeit Dior Products into the United States, including Illinois.

23.     Defendants' use of the CHRISTIAN DIOR Trademarks in connection with the advertising, distribution, offering for sale, and sale of Counterfeit Dior Products, including the sale of Counterfeit Dior Products into the United States, including Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Dior.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

24.     Dior hereby re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 23.

25.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the federally registered CHRISTIAN DIOR Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods.   The CHRISTIAN DIOR Trademarks are highly distinctive marks. Consumers have come to expect the highest quality from Dior Products offered, sold or marketed under the CHRISTIAN DIOR Trademarks.

26.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of the CHRISTIAN DIOR Trademarks without Dior's permission.

27.     Dior is the exclusive owner of the CHRISTIAN DIOR Trademarks.  Dior's United States Registrations for the CHRISTIAN DIOR Trademarks (Exhibit 1) are in full force and effect.  Upon information and belief, Defendants have knowledge of Dior's rights in the CHRISTIAN DIOR Trademarks, and are willfully infringing and intentionally using counterfeits of the CHRISTIAN DIOR Trademarks.  Defendants' willful, intentional and unauthorized use of the CHRISTIAN DIOR Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the Counterfeit Dior Products among the general public.

28.     Defendants'   activities   constitute   willful   trademark   infringement   and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

29. Dior has no adequate remedy at law, and if Defendants' actions are not enjoined, Dior will continue to suffer irreparable harm to its reputation and the goodwill of its well-known CHRISTIAN DIOR Trademarks.

30. The injuries and damages sustained by Dior have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of Counterfeit Dior Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

31. Dior hereby re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 30.

32. Defendants' promotion, marketing, offering for sale, and sale of Counterfeit Dior Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Dior or the origin, sponsorship, or approval of Defendants' Counterfeit Dior Products by Dior.

33. By using the CHRISTIAN DIOR Trademarks on the Counterfeit Dior Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Counterfeit Dior Products.

34. Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Counterfeit Dior Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

35. Dior has no adequate remedy at law and, if Defendants' actions are not enjoined, Dior will continue to suffer irreparable harm to its reputation and the goodwill of its Dior brand.

16

## COUNT III
## VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
## (815 ILCS § 510, *et seq.*)

36.     Dior hereby re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 35.

37.     Defendants have engaged in acts violating Illinois law including, but not limited to, passing off their Counterfeit Dior Products as those of Dior, causing a likelihood of confusion and/or misunderstanding as to the source of their goods, causing a likelihood of confusion and/or misunderstanding as to an affiliation, connection, or association with genuine Dior Products, representing that their products have Dior's approval when they do not, and engaging in other conduct which creates a likelihood of confusion or misunderstanding among the public.

38.     The foregoing Defendants' acts constitute a willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, *et seq*.

39.     Dior has no adequate remedy at law, and Defendants' conduct has caused Dior to suffer damage to its reputation and goodwill.  Unless enjoined by the Court, Dior will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

## PRAYER FOR RELIEF

WHEREFORE, Dior prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

    a. using the CHRISTIAN DIOR Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine

17

Dior Product or is not authorized by Dior to be sold in connection with the CHRISTIAN DIOR Trademarks;

b. passing off, inducing, or enabling others to sell or pass off any product as a genuine Dior Product or any other product produced by Dior, that is not Dior's or not produced under the authorization, control, or supervision of Dior and approved by Dior for sale under the CHRISTIAN DIOR Trademarks;

c. committing any acts calculated to cause consumers to believe that Defendants' Counterfeit Dior Products are those sold under the authorization, control or supervision of Dior, or are sponsored by, approved by, or otherwise connected with Dior;

d. further infringing the CHRISTIAN DIOR Trademarks and damaging Dior's goodwill; and

e. manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Dior, nor authorized by Dior to be sold or offered for sale, and which bear any of Dior's trademarks, including the CHRISTIAN DIOR Trademarks, or any reproductions, counterfeit copies or colorable imitations thereof;

2) Entry of an Order that, at Dior's choosing, the registrant of the Defendant Domain Names shall be changed from the current registrant to Dior, and that the domain name registries for the Defendant Domain Names, including, but not limited to, VeriSign, Inc., Neustar, Inc., Afilias Limited, CentralNic, Nominet, and the Public Interest Registry, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of Dior's

selection, and that the domain name registrars, including, but not limited to, GoDaddy Operating Company, LLC ("GoDaddy"), Name.com, PDR LTD. d/b/a PublicDomainRegistry.com ("PDR"), and Namecheap Inc. ("Namecheap"), shall take any steps necessary to transfer the Defendant Domain Names to a registrar account of Dior's selection; or that the same domain name registries shall disable the Defendant Domain Names and make them inactive and untransferable;

3) Entry of an Order that, upon Dior's request, those in privity with Defendants and those with notice of the injunction, including, without limitation, any online marketplace platforms such as iOffer, eBay, AliExpress, and Alibaba, web hosts, sponsored search engine or ad-word providers, credit cards, banks, merchant account providers, third party processors and other payment processing service providers, Internet search engines such as Google, Bing, and Yahoo, and domain name registrars, including, but not limited to, GoDaddy, Name.com, PDR, and Namecheap, (collectively, the "Third Party Providers") shall:

   a. disable and cease providing services being used by Defendants, currently or in the future, to engage in the sale of goods using the CHRISTIAN DIOR Trademarks;

   b. disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the CHRISTIAN DIOR Trademarks; and

   c. take all steps necessary to prevent links to the Defendant Domain Names identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant Domain Names from any search index;

4) That Defendants account for and pay to Dior all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement

of the CHRISTIAN DIOR Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

5) In the alternative, that Dior be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the CHRISTIAN DIOR Trademarks;

6) That Dior be awarded its reasonable attorneys' fees and costs; and

7) Award any and all other relief that this Court deems just and proper.

Dated this 18th day of January 2018.         Respectfully submitted,

/s/ Justin R. Gaudio/
Amy C. Ziegler
Justin R. Gaudio
Jessica L. Bloodgood
Greer, Burns & Crain, Ltd.
300 South Wacker Drive, Suite 2500
Chicago, Illinois 60606
312.360.0080
312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law
jbloodgood@gbc.law

*Counsel for Plaintiff Christian Dior Couture, S.A.*